**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

UNITED STATES OF AMERICA

v.                                                              No. 1:24-CR-00028

TODD STEWART WILLIAMS

---

**SENTENCING MEMORANDUM**
**FILED ON BEHALF OF TODD WILLIAMS**

---

**I. Introduction**

Comes Todd Williams, through counsel, and submits the following sentencing

memorandum pursuant to 18 U.S.C. §3553(a), which directs the Court to consider the history

and characteristics of the defendant and the nature and circumstances of the offense, among other

factors, in order to fashion a sentence that is sufficient, but not greater than necessary to comply

with the goals set forth in the statute.  In *Koon v. United States*, 518 U.S. 81, 113 (1996), Justice

Kennedy observed:

> It has been uniform and constant in the federal judicial
> tradition for the sentencing judge to consider every
> convicted person as an individual and every case as a
> unique study in the human failings that sometimes mitigate,
> sometimes magnify, the crime and the punishment to ensue.

After making the required "individualized assessment" of the defendant and considering all of

the factors set forth in 18 U.S.C. § 3553(a), Mr. Williams requests that the Court vary from the

advisory guideline range and impose a sentence below the statutory maximum.  *See Gall v.*

*United States*, 552 U.S. 38, 50 (2007).

In the instant case, the parties have negotiated a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Plea agreements entered into under this provision "agree that a specific . . . sentencing range is the appropriate disposition of the case . . . ." Fed. R. Crim. P. 11(c)(1)(C). In considering whether to accept an agreement that includes a specific sentencing range, the Court should accept the agreement when the Court is satisfied that the agreed sentence is outside the applicable range for "justifiable reasons." U.S.S.G. §6B1.2(c).

As outlined more fully below, there are justifiable reasons that support the proposed sentencing range in this case, considering Mr. Williams' personal history, the unique facts in this case, and other factors including the Court's mandate to impose sentences in light of their overall reasonableness. *See Booker*, 543 U.S. 220. The advisory guideline term of imprisonment of 360-1,440 months as noted in the PSR cannot be considered reasonable. [Doc. 56 at Pageid# 214]. Such a sentence is excessive and does not allow for an individualized assessment in imposing a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing. See 18 U.S.C. §3553.

The plea agreement negotiated by the parties takes into account the facts and circumstances of this case, the applicable sentencing guidelines, the factors relevant to sentencing set out in 18 U.S.C. §3553, and the Court's mandate to consider defendants as individuals. The agreement was reached after discovery review and extensive negotiations between Mr. Williams and the United States related to the facts in this case, the anticipated proof, and the anticipated guideline range. Accordingly, Mr. Williams requests that the Court vary from the advisory guideline range and impose a sentence below the statutory maximum.

## II. 18 U.S.C. §3553 Factors

Before addressing the statutory factors that contribute to the Court's sentencing calculus, Mr. Williams wants to make clear that he fully accepts responsibility for his conduct in this case. Mr. Williams recognizes the harm he has caused to the victims in this case, their families, and the larger community. Nothing herein should be interpreted as an attempt to soften Mr. Williams' previous admissions or deflect from his accepting responsibility for his conduct. Mr. Williams has made a sincere attempt to highlight the real-world wreckage that his guilty plea has left in its wake and explain his rationale for a sentence less than the statutory maximum.

### A. Nature and Circumstances of the Offense

The offense conduct in this case is one of many factors the Court must consider in fashioning an appropriate sentence. The Agreed Statement of Facts [Doc. 47] filed on March 20, 2025, accurately recites the offense conduct in this case. The offense conduct listed in the Presentence Investigation Report at pages 5-11 is mostly accurate. Mr. Williams accepted responsibility for his conduct by pleading guilty.

Mr. Williams is not accused of committing a contact sexual offense. Mr. Williams never had physical contact with any underage individual(s). He is not accused of receiving monetary compensation for his conduct. Mr. Williams' offense conduct consisted of communicating with underage individuals online and persuading them to send explicit images and videos containing child sex abuse material. Mr. Williams paid the victims for the material through various cash apps. There does not appear to be any evidence that Mr. Williams distributed the materials he received from the underage individuals.

Mr. Williams has no intent of trying to excuse or justify his behavior. Mr. Williams admitted what he did and accepted responsibility for his actions. Although he recognizes the

significant punishment he is facing, he asks the Court to consider the fact that he has no prior history of sexual offending, no prior criminal history, no history of violent behavior, and no prior history of mental health or substance abuse issues. Mr. Williams has the potential for rehabilitation.

**B. History and Characteristics of Todd Williams**

Todd Williams was born in Monroe, Louisiana, but was raised in upper East Tennessee. When his parents divorced, Todd was six years old. He did not have a close relationship with his father, and only saw him on rare occasions. Todd was raised by his mother, Audrey Hansard, and his step-father, Hobart Hansard. Todd was raised in a stable and loving environment. He did not suffer abuse in the home and was not exposed to substance abuse in the home. Todd continues to maintain a very close relationship with his mother, step-father, and his sister, Leanne Wilburn. This stable family connection is an indicator of the social support Todd has in his life.

Todd graduated from Dobyns Bennet High School in Kingsport, Tennessee and then attended Virginia Tech. Todd obtained a Bachelor's degree in Forest Products Marketing and Management in 1994. With a new degree in hand, Todd began a professional career that spanned almost thirty years. Todd has demonstrated his ability to maintain a productive professional career. Todd found his career fulfilling and meaningful. His employment history indicates that he is someone who is goal oriented and has the ability to work independently. Todd's longest period of employment was with Wurth Wood Group, where he worked for approximately 12 years in sales. Todd was a three-time member of the President's Club at Wurth, an honor given to salespeople with exemplary performance. Todd was most recently employed as a sales manager with Blum, USA, where he supervised a number of sales representatives. In addition to his thirty years experience in industrial sales, Todd has experience in marketing analysis.

Although Todd never married, he did help raise three disadvantaged children.  In 2010, Todd was introduced to a family that was experiencing terrible hardship.  At the time, the two boys were 13 years old and 11 years old, respectively.  The boys' father was in and out of jail and provided little to no support for his sons.  The mother did not have the ability to care for her sons, so each child was living with a different grandmother.

The younger of the two boys had attended approximately 19 custody hearings and had been placed with different family members and in various foster homes multiple times.  In 2012, Todd became his legal guardian.  Todd assumed financial responsibility and began raising this young man as his own son.  The older brother visited his brother at Todd's home frequently and Todd began providing financial support for him as well.  Todd created a stable and safe environment for these young men.  Todd helped the kids with homework, he made sure they got to sporting events, he provided them with an emotional and supportive home.  The impact on their lives has been incredible.

The older of the two boys is now 29 years old.  He attended a local community college and is enjoying a successful career.  He has been in a stable relationship for more than seven years and is engaged to be married.  The younger brother is now 26 years old.  He graduated from Emory & Henry University and is pursuing his professional career as a business analyst. He has been in a long-term relationship for five years and is engaged to be married.

Todd found purpose and deep fulfillment in helping others.  Around this same time, Todd took in a third child who was about twelve years old.  Todd took on responsibility for raising this young man and provided him financial support.  The stability Todd provided resonated with this young man.  He ultimately graduated high school at the top of his class.   He went on to graduate

from Emory & Henry University and is poised to graduate from pharmacy school in the Spring, 2026.

Todd's service to others was not confined to his personal life. In 2015, he was appointed to the Smyth County School Board, the largest employer in the county. Todd was elected to remain in that office three times. While on the school board, Todd helped in hiring superintendents, coaches, and administrators. Todd contributed to the educational development of more than 3000 students in the school system at any given time. Todd served as vice-chair of the school board and on the facilities committee which oversaw the care and maintenance of 14 school properties.

Todd has been an active member in his community. He has engaged in public service and raised children in Chilhowie, Virginia. He has been an active member of the United Methodist Church community.

Several family members and friends have written letters to the Court on Todd's behalf. (Collective Exhibit 1). These letters, appropriately, do not comment on the facts of the case, and they do not try to excuse or justify his conduct. Rather, these letters offer the Court meaningful insight into Todd's personality and character that are deserving of consideration. These letters offer perspectives from people who have known Todd for decades.

The consistent theme that is conveyed by those who know him best, is that Todd Williams is capable of giving and that he has a loyal network of support. Todd has had a demonstrably positive impact on the lives of three young men and helped them break a cycle of addiction and poverty. These are real world examples of Todd's positive impact.

Todd recently underwent a psychological evaluation and risk assessment for future sexual offending. (Exhibit 2, requested to be filed under seal). As an initial matter, the report

accurately reflects Todd's background and history. Importantly, the psychological evaluation reveals that Todd does not suffer from a history of mental health issues.

The risk assessments reveal that Todd poses a low risk of committing a sexual offense in the future. Likewise, current research indicates that the risk of recidivism drops dramatically after the age of sixty (60). Todd is currently 54 years old and is facing a mandatory minimum term of imprisonment of fifteen (15) years. By any measure, Todd is facing a very significant sentence. In reality, at a minimum, Todd is facing incarceration for the majority of the remainder of his life.

Todd Williams committed a serious offense and accepted responsibility for his actions and appropriately pleaded guilty. This case, however, is but one component of a multi-faceted life. Todd Williams is a college graduate who has maintained a successful professional career for almost thirty years. He has a loving family and friends who continue to offer him emotional support. Todd has never been involved in the criminal justice system prior to this arrest. Based on his education, past employment, and age, Todd Williams has a very high likelihood of achieving meaningful rehabilitation.

**C. Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment**

Just punishment and promoting respect for the law can be achieved through a significant sentence below the statutory maximum. As the Court has seen throughout this case via his guilty plea, acceptance of responsibility, and remorse, Todd has the utmost respect for the law and this Court. In addition to facing a significant period of incarceration, Todd has suffered a litany of collateral consequences that are unique to educated professionals with no prior criminal history.

Todd's employment was terminated and he will never hold any sort of public office again. It is fair to say that Todd will never enjoy a professional career. He will be labeled a felon for the

rest of his life and will likely have to register as a sex offender for the remainder of his life.

Todd has accepted that fact and hopes the Court will give significant weight to these collateral

consequences.

Unlike many defendants who stand before the Court, Todd worked hard to get an

advanced education and to better his position in life.  All of that work, and Todd's effort to

establish a good reputation, has been dashed to bits and replaced by constant embarrassment and

shame for his conduct.  These, admittedly, self-inflicted emotional wounds are unpredictable yet

ever-present reminders of his failings.

This conviction resulted in a number of collateral consequences that carry particular

significance for a person who has never been in trouble.  Todd lost valuable civil rights.  Todd

views voting as a civic duty and privilege.  That right is gone.  Todd suffered severe financial

penalties as a consequence of his offense.  As a lifelong outdoorsman and hunter, Todd is acutely

aware that he will never be permitted to own a firearm again.  In sum, the above-referenced

collateral consequences are real and long-lasting.  It is respectfully suggested that these collateral

consequences collectively reduce the need for the statutory maximum term of imprisonment.

### D. Deterrence

Todd Williams poses a low risk of re-offending.  Todd will be incarcerated for a

significant period of time.  There is no demonstrable need for the statutory maximum term of

imprisonment as a means of specific deterrence.  The certainty of punishment in this case is a

greater deterrent to Todd Williams, and those with similar history and character, than the length

of punishment.[1]

Addressing the concept of general deterrence, it seems fair to observe that even the

---

[1] *See generally* "Deterrence in Criminal Justice Evaluating Certainty vs. Severity of Punishment,"
Valerie Wright, Ph.D., November 2010.

mandatory minimum sentence in this case would serve as a powerful deterrent to the general

public.  Most people would look at Todd's situation and recognize that he has lost everything and

has absolutely nothing left.  He is a convicted felon and sex offender, his career is over, he is in

financial ruins, and he is facing what amounts to a life sentence.  No reasonable person could

look at Todd's current situation and consider the reward worth the risk.

### E.  Need to Protect the Public and the Need for Correctional Treatment

Although the need to protect the public and the need for correctional treatment are

independent considerations under 18 U.S.C. 3553(a), they are interdependent in this case.  Mr.

Williams acknowledges the Court's concern about protecting the public.  In this case, the risk of

future re-offending is significantly reduced based on Mr. Williams' age at the time of his earliest

possible release date and the availability of multiple treatment options.

Mr. Williams recognizes the need for mental health treatment, specifically the Sex

Offender Treatment Programs offered by the Bureau of Prisons.  Accordingly, Mr. Williams

requests that the Court recommend to the BOP that he be assigned to FCI Elkton or FCI Butner.

Both of these facilities provide the kind of treatment that would further Mr. Willimas' efforts at

rehabilitation.

Contrary to conventional wisdom, current research indicates that sex offender treatment

works at reducing the risk of future re-offending.  In 2015, the Department of Justice's Office of

Justice Programs conducted a review of scientific literature studying the effectiveness of

treatment for adult sexual offenders.  U.S. Dep't of Justice, Office of Justice Programs, Office of

Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking "The

Effectiveness of Treatment for Adult Sexual Offenders." Robert Przybylski, July, 2015.[2]

---

[2]

https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/theeffectivenessoftreatmentforadultsexualoffend
ers.pdf

Although the report indicated that additional study was needed, it concluded that "the evidence

suggests that treatment for sex offenders—particularly cognitive-behavioral/relapse prevention

approaches—can produce reductions in both sexual and nonsexual recidivism." *Id.* at 4. The

report cited a study of risk principles by Lovins, Lovekamp, and Latessa (2009) which found that

"high-risk sex offenders who completed intensive residential treatment were more than two times

less likely to recidivate than high-risk sex offenders who were not provided intensive treatment."

*Id.* at 3. These conclusions are consistent with Dr. Imhof's conclusions. (*See* Exhibit 2 at pg. 8).

The Court has additional tools at its disposal to further reduce any risk of re-offending.

In his report, Dr. Imhof recommends that Mr. Williams undergo sex offender treatment that

includes a cognitive behavioral component to reduce the risk of re-offending. (Exhibit 2 at 8).

Dr. Imhof states that "empirical literature has indicated that those offenders who complete a

comprehensive treatment program as described above are up to 37% percent less likely to

commit a sexual offense in the future." *Id.* Dr. Imhof recommends that Mr. Williams participate

in mental health treatment while on supervised release because empirical evidence indicates that

"individuals who participate in community supervision in conjunction with mental health

treatment focused on sex offense issues reoffended 66% less than those individuals who did not

participate in these services." *Id.*

Todd Williams is 54 years old, has a college degree, and maintained a professional career

for almost thirty years. The United States Sentencing Commission has found that college

graduates have the lowest rates of recidivism. *Recidivism of Federal Offenders Released in 2010*

(U.S.S.C. September, 2021).[3] Todd Williams is a well educated, non-violent, non-addicted,

no-prior-contact-with-law-enforcement, responsibility-accepting defendant with a stable social

---

[3]https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

and family network. The United States Sentencing Commission's wide-ranging, fifteen-year study of recidivism among "first offenders" highlights the fact that Mr. Williams' risk of re-offending is extraordinarily low. *Recidivism and the "First Offender," Release 2*, (U.S.S.C. May, 2004).[4] Offenders, like Mr. Williams, with zero criminal history and no prior law enforcement contact do not recidivate 93.2% of the time. *Id*. at pg. 26.

### III. OTHER SENTENCING CONSIDERATIONS

#### A. The Kinds of Sentences Available and the Range Established by the Guidelines

The advisory guideline range in this case is substantially greater than sentences actually imposed in similar cases. (*See* Presentence Investigation Report, Doc. 55, Pageid# 192). Based on his age, any sentence within the negotiated range of 180-360 months means that Mr. Williams will spend the vast majority of the rest of his life incarcerated. A sentence less than the statutory maximum leaves open a remote possibility that Mr. Williams may be released in the waning years of his life.

Older offenders age more quickly than younger offenders while incarcerated. Empirical data shows that there is a linear relationship between incarceration and life expectancy. Evelyn J. Patterson: "The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003*" American Journal of Public Health* 103, 523_528 (2013).[5] In a 2013 analysis of New York state parole data, Professor Patterson found that each year lived behind bars correlates to a two year reduction in life expectancy. *Id.* In the population of parolees she studied, five years in prison increased the odds of death by 78% and reduced the expected life span at age 30 by 10 years. *Id.* This finding is consistent with other studies that have found a long-term

---

[4] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivis m_First_Offender.pdf
*See more broadly*, *Recidivism and Federal Sentencing Policy*, United States Sentencing Commission, 2021, (confirming factors like youth and criminal history category are strongest predictors of recidivism).
[5] https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2012.301148

association between imprisonment and mortality resulting in a loss of life expectancy of

approximately 13% of current US life expectancy at age 45.  Daza, Sebastian *et al*. "The

Consequences of Incarceration for Mortality in the United States." *Demography* vol. 57(2)

(2020): 577-598.[6]

It is clear that any sentence imposed by the Court will have a profound impact on Mr.

Williams.  His life expectancy will be drastically reduced.  Mr. Williams respectfully submits

that while a significant sentence is appropriate, a *de facto* life sentence is not necessary in this

case.

The Court has a panoply of specialized conditions of supervision that can be imposed

after Mr. Williams serves a significant term of imprisonment.  The Court's broad discretion to

impose conditions of supervision is complimented by its co-equal ability to modify those

conditions or revoke supervised release entirely in the face of changing or unforeseen

circumstances, pursuant to 18 U.S.C. § 3583(e).  This authority to modify or revoke supervised

release means the Court will always be in full command of the circumstances of Mr. Williams'

release in the community.  Given its virtually unfettered ability to impose, modify, and revoke

supervised release, the Court should never find itself without a means to achieve an appropriate

outcome.  *See* generally 18 U.S.C. § 3583(e).

### B.  Policy Statements Issued by the Sentencing Commission

In October, 2021, the United States Sentencing Commission published "Federal

Sentencing of Child Pornography: Production Offenses."[7]  This report updated a similar report

published by the Commission in 2012.  The report makes a number of key findings.

---

[6] https://pmc.ncbi.nlm.nih.gov/articles/PMC7710643/pdf/nihms-1645870.pdf
[7] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf

First, in fiscal year 2019, a substantial percentage of production cases, 41%, involved more than one victim.  *Id.* at 4.  Likewise, in FY 2019 the vast majority of production cases, 80.9%, involved sexual contact of a minor.  Finally, almost half of the offenders, 45.7%, sentenced in fiscal year 2019 received an enhancement pursuant to §2G2.1(b)(6)(B) for use of a computer. *Id.* at 13.  The overwhelming majority of the FY 2019 offenders, 78%, were convicted under a statute carrying a 15 year mandatory minimum term of imprisonment.  *Id.* at 3.  Finally, in cases that involved victims engaging in sexual contact alone or with another victim, offenders were sentenced to an average of 244 months imprisonment.  *Id.* at 47.  With these metrics in mind, it is important to note that in fiscal year 2019, the average child production offender was sentenced to 275 months imprisonment.  *Id.*

The Commission recognized that in FY 2019, most production offenders received a sentence below the applicable advisory guideline range.  *Id.* at 54.  Sentences were typically longer based on a number of enhancing factors like proximity to the victim, physical participation in the offense, offenses involving toddlers or infants and other factors not present in the instant case.  *Id.*  The offense conduct in Mr. Williams' case is remarkably similar to the FY 2019 case statistics cited above. This collection of empirical data by the Commission illustrates that a sentence below the statutory maximum is warranted in the instant case.

### C.  Need to Avoid Sentencing Disparities

Following *Booker*, the majority of circuits have held that the need to avoid disparities focuses on "national disparities between defendants with similar records who have been found guilty of similar conduct . . . ."  *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008).  The United States Sentencing Commission compiles data that is intended to assist courts in avoiding national disparities.  Mr. Williams submits that a sentence below the statutory maximum is

appropriate and would avoid the risk of disparities in sentencing as it relates to similarly situated defendants. The data compiled by the Sentencing Commission supports this argument.

As outlined in the Presentence Investigation Report, the Judiciary Sentencing Information [JSIN] database identified 241 similarly situated defendants sentenced in fiscal years 2020-2024. These 241 defendants shared a final offense level 42, criminal history category I.[8] All were sentenced using §2G2.1 as the primary guideline. None of these defendants received a departure pursuant to §5K1.1. The data reveals that the average sentence imposed was 299 months and the median sentence imposed was 300 months.

Mr. Williams has endeavored to provide the Court with reliable sentencing data compiled by the Commission over a long time period. The sentencing data indicates that the vast majority of production offenders are sentenced below the advisory guideline range. Between FY 2005-2019, the average advisory guideline minimum for child pornography production offenders increased steadily, from an average of 273 months to an average of 332 months. (Federal Sentencing of Child Pornography: Production Offenses, pg. 21). During that same timeframe, the average sentence decreased from an average sentence of 281 months to an average sentence of 275 months. *Id.*

The same trend appears to be present based on the JSIN data cited above. From FY 2020-2024, the median sentence imposed was 300 months. No matter how one analyzes the data, a 275-300 month sentence is incredibly significant. This data indicates that over an extended timeframe, courts across the country are imposing significant sentences below the statutory maximum for the same conduct at issue in this case.

---

[8] Although criminal history category I encompasses offenders with 1 criminal history point, Mr. Williams has zero criminal history points.

### D. Restitution

At the time of the filing of this motion, undersigned counsel is unaware of any requests for restitution made by any victim in this case.

### IV. Request for Placement

As mentioned previously, Mr. Williams requests that the Court recommend to the Bureau of Prisons that he be designated to FCI Elkton or FCI Butner so that he can avail himself of the treatment options available at those facilities.

### V. Witnesses and Exhibits

Mr. Williams anticipates that he will call Dr. Eric Imhof to testify on his behalf at the sentencing hearing. Dr. Imhof's report has been made an exhibit to this Sentencing Memorandum.[9] Other than the letters written on Mr. Williams' behalf, which have been attached as an exhibit, Mr. Williams does not anticipate submitting any additional exhibits. Pursuant to Fed. R. Crm. Pro 32(i)(4)(ii), Mr. Williams reserves the right to allocute at the sentencing hearing.

### VI. Conclusion

For the foregoing reasons, Todd Williams respectfully submits that after conducting an individualized assessment of his history and characteristics and the other factors set forth in 18 U.S.C. § 3553, a sentence below the statutory maximum is sufficient but not greater than necessary in this case.

---

[9] Mr. Williams has requested that Dr. Imhof's report be filed under seal.

Respectfully submitted on July 17, 2025.

s/ Robert R. Kurtz
Robert R. Kurtz
BPR No. 20832
625 Market Street, Ste. 901
Knoxville, TN 37902
865-522-9942
rrkurtz@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to counsel of record on July 17, 2025.

s/ Robert R. Kurtz
Robert R. Kurtz